## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BONNIE RAPCHAK**, *Executrix of the Estate of John E. Borzik, Deceased*, | ) ) ) |
| **Plaintiff,** | ) **2:13-cv-1307** ) |
| **v.** | ) ) |
| **HALDEX BRAKE PRODUCTS CORPORATION**, | ) ) ) |
| **Defendants.** | ) ) |

## MEMORANDUM OPINION

Now pending before the Court is PLAINTIFF'S MOTIONS IN LIMINE AND REQUEST FOR EVIDENTIARY RULINGS (ECF No. 188), with a brief in support (ECF No. 189). Defendant filed a brief in opposition (ECF No. 195), and Plaintiff filed a reply brief (ECF No. 198). Accordingly, the motion is ripe for disposition.

### A. Background

Since the Court writes only for the parties, who are familiar with the facts of this case, they will not be recounted at length. It suffices to say that decedent, John E. Borzik, died from asphyxiation on September 11, 2011, when his Gulfstream TourMaster motorhome, equipped with an air suspension system, descended about 2½ to 3 inches onto his chest while he was lying underneath it performing maintenance work. Defendant, Haldex Brake Products Corporation ("Haldex"), designed, manufactured, and sold the height control valves ("HCV") used in the air suspension system of the motorhome, which Plaintiff alleges were defectively designed.

On March 15, 2016, the Court denied Haldex's motion for summary judgment, along with its motion *in limine* to exclude the testimony of Plaintiff's engineering expert, Ervin

Vandenberg (ECF No. 185). Thereafter, the Court ordered the parties to file pretrial statements, which were filed on March 29, 2016, and April 4, 2016, respectively. Trial in this matter has not yet to be scheduled.

**B. Discussion**

In the now-pending motion, Plaintiff seeks to preclude Haldex from introducing or making:

(1) [a]ny argument or evidence of using concepts of negligence or due care on the part of the defendant in designing, making, and selling the subject product, including evidence of compliance with state-of-the-art practices, industry standards, or government regulations[;]

(2) [a]ny argument or evidence of opinions or beliefs of Freightliner Custom Chassis Corporation (FCCC) regarding the safety or quality of the subject HCV[;]

(3) [a]ny argument or evidence attempting to prove that FCCC was negligent or at fault in its design of its chassis so as to be a cause of the subject incident[;]

(4) [a]ny argument or evidence suggesting or attempting to prove contributory negligence on the part of decedent[;]

(5) [a]ny reference to or use of documents produced by Power Gear relative to the use of a leveling system on the motorhome which was not being used[;]

(6) [a]ny reference to or evidence that decedent failed to use jack stands, jacks, blocks or other devices to support the suspension when the engine was off and he was not changing a tire or jacking/raising the suspension or frame of the motorhome[;]

(7) [a]ny reference to or evidence calculated to argue assumption of the risk [;]

(8) [a]ny reference to or evidence of the beliefs or lay opinions of witnesses regarding decedent's actions, judgment or attitudes on dates preceding the subject incident or with his interaction with the motorhome on the day of his death[;]

(9) [a]ny evidence of a lack of prior claims of injury or death related to a malfunctioning CR model valve[;]

(10)    [a]ny reference or evidence of receipt by decedent of collateral sources of

> money[;] [and]

(11)     [a]ny reference to or evidence that decedent was involved in a motorcycle collision years before and/or received compensation.[1]

Pl.'s Mot. 1-2. These issues will be addressed *seriatim*.

Prior to doing so, however, the Court will take a moment to reflect on the effect of the Supreme Court of Pennsylvania's decision in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 389 (Pa. 2014), on the state of products liability law in Pennsylvania. "The principal impact of *Tincher* is twofold." *Punch v. Dollar Tree Stores, Inc.*, No. CV 12-154, 2015 WL 7769223, at *3 (W.D. Pa. Nov. 5, 2015). First, the Supreme Court "overruled the seminal case of *Azzarello v. Black Brothers Co.*, 391 A.2d 1020 (Pa. 1978), which created a distinct dichotomy between strict liability and negligence claims in Pennsylvania that ultimately led to trial courts 'directing that negligence concepts have no place in Pennsylvania strict liability doctrine.'" *Id.* (quoting *Tincher*, 104 A.3d at 376). In overruling *Azzarello*, the *Tincher* Court also made clear that it is now up to the jury not the judge to determine whether a product is in a "defective condition unreasonably dangerous" to the consumer. *Lewis v. Lycoming*, No. CIV.A. 11-6475, 2015 WL 3444220, at *4 (E.D. Pa. May 29, 2015) (citing *Tincher*, 104 A.3d at 335); *Amato v. Bell & Gossett*, 116 A.3d 607, 620 (Pa. Super. Ct. 2015). "Second, the *Tincher* Court declined to adopt the *Restatement (Third) of Torts* to replace the *Azzarello* standards abrogated by its decision, because it 'presumes too much certainty about the range of circumstances, factual or otherwise, to which the "general rule" articulated should apply.'" *Punch*, 2015 WL 7769223, at *3 (quoting *Tincher*, 104 A.3d at 398). Thus, "Pennsylvania remains a *Second Restatement* jurisdiction[.]" *Tincher* 104 A.3d at 415. Under the *Second Restatement*, "the cause of action in strict products

---

1.     Haldex has indicated that it does not intend to introduce any evidence of collateral sources of money or related to decedent's prior motorcycle accident, so those aspects of Plaintiff's motion are moot and need not be discussed herein.

liability requires proof . . . either of the ordinary consumer's expectations or of the risk-utility of a product." *Id.* at 417. "[T]his is a combined test that requires the plaintiff to meet only one of the two standards, which may be pled in the alternative." *Punch*, 2015 WL 7769223, at *3 (citing *Tincher*, 104 A.3d at 391).

In this case, Plaintiff is proceeding under the risk-utility theory. "The risk-utility test offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was reasonable, which obviously reflects the negligence roots of strict liability." *Tincher*, 104 A.3d at 398 (citations omitted). Under the test, "a product is in a defective condition if a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Id.* "Other jurisdictions have generally cited favorably the works of Dean Wade, which articulated factors relevant to the manufacturer's risk-utility calculus implicated in manufacturing or designing a product." *Id.* Dean Wade's non-exhaustive list of factors takes into consideration:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious

condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* at 398-99 (citation and quotation marks omitted). However, "while these considerations may provide a holistic perspective on a manufacturer's choice to bring a product to market, they may not be immediately responsive in the (typical) case implicating allegations relating to a particular design feature." *Id.* (citation omitted).

### 1. Evidence of Due Care on the Part of Haldex

Prior to *Tincher*, this type of evidence was not admissible in a products liability action. *See Lewis v. Coffing Hoist Division, Duff-Norton Co., Inc.*, 528 A.2d 590, 593-94 (Pa. 1987); *Carrecter v. Colson Equip. Co.*, 499 A.2d 326, 330–31 (Pa. Super. Ct. 1985). This rule was premised on the dichotomy between strict liability and negligence that existed under *Azzarello*. *See Lewis*, 528 A.2d, at 594 (explaining that because "evidence of industry standards . . . go[es] to the reasonableness of the [defendant's] conduct . . . such evidence would have improperly brought into the case concepts of negligence law"). However, "[t]he *Lewis* majority's reasoning, based on *Azzarello* and the then-impermissible comingling of negligence and strict liability concepts, conflicts with *Tincher*'s pronouncement that a manufacturer's conduct and reasonableness is relevant to the determination of product defect." *Sliker v. Nat'l Feeding Systems, Inc.*, No. 282 CD 2010, 2015 WL 6735548, at *7 (Pa. Com. Pl. Clarion Cnty., Oct. 18, 2015). As the *Lewis* dissent recognized, "industry standards are written by specialized individuals with knowledge of product design superior to that of courts and, as a result, evidence of such standards is relevant to the question of defect[.]" *Tincher*, 104 A.3d at 369. Accordingly, although evidence of "compliance with industry standards" is not a complete defense to a

plaintiff's strict liability claim, "or even 'necessarily' [] 'highly probative,' . . . without affirmative authority from *Tincher* or any other post-*Tincher* precedential decision [of the Pennsylvania Supreme Court] barring such evidence . . . the principles of *Tincher* counsel in favor of its admissibility." *Sliker*, 2015 WL 6735548, at *7.

Be that as it may, Plaintiff has not specifically identified any such evidence that she believes Haldex intends to introduce (e.g., any exhibits or deposition transcript excerpts mentioning or discussing industry or government standards or the current state-of-the-art). Nor has Haldex identified any such evidence. So it seems premature to rule on the admissibility of this type of evidence at this time. Without knowing the particular evidence that Haldex intends to rely upon (or even if Haldex actually intends to introduce any such evidence), the Court cannot assess its relevancy to the risk-utility test and hence its admissibility under Rules 401 through 403. Accordingly, Plaintiff's motion to preclude Defendant from introducing evidence of state of the art and compliance with industry and government standards will be denied without prejudice. Plaintiff may re-raise the issue at trial if Defendant attempts to introduce any evidence that falls into these categories, at which time the Court will be able to better evaluate its admissibility.

## 2. Testimony from FCCC regarding the safety and quality of the HCV

The parties dispute whether Haldex should be permitted to offer testimony from a FCCC representative to the effect that FCCC "considers the Haldex height control valves to be of high-quality with no inherent defects and continues to keep using them because they meet the requirements of their application." Def.'s Br. 21. According to Haldex, "evidence of FCCC's assessment of the safety aspects and quality of the HCV is highly probative of how a reasonable manufacturer would assess whether the probability and seriousness of the harm caused by the HCV outweigh the burden or costs of taking precautions" and thus is "admissible under the risk-

utility test" – particularly, the second Wade factor, which allows for consideration of the safety aspects of the product as designed. *Id.*

The Court disagrees. Contrary to Haldex's argument, it does not matter that a "reasonable *manufacturer*" thought the valves were "high quality." For one thing, the risk-utility test is analyzed from the perspective of a "reasonable *person*." *Tincher*, 104 A.3d at 389 (emphasis added). More to the point, Haldex's argument looks like an attempt to have FCCC corporate designee, Nicholas Rini, offer his lay opinion as to how the jury should resolve the risk-utility question – to, in effect, tell the jury, "FCCC didn't see any problems with the way the valves are designed, so you shouldn't either." But that is the ultimate issue that the jury will be asked to decide, and the lay opinion of FCCC's corporate designee would not be helpful to the jury's determination. *See Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 226 (3d Cir. 2008) (quoting *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986)) ("'[S]eldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an "oath helper."'"). Haldex has not even attempted to explain how the testimony of Mr. Rini – who has not been proffered as an expert – could possibly describe "[t]he safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury." *Id.* (quoting the second Wade factor). Indeed, at least according to the representations of Plaintiff, which have not been refuted by Haldex, Mr. Rini did not even display a "basic familiarity" with the HCV, so it is entirely unclear how he could offer any perspective on the risks posed by the valve as designed.

Be that as it may, since the Court has not been fully apprised of the testimony that Haldex intends to offer from Mr. Rini, the Court cannot say with certainty that none of it is relevant to

the risk-utility test. Thus, the Court will not bar Mr. Rini from testifying, but Plaintiff may re-raise this issue at trial.

### 3. Evidence of FCCC's Alleged Fault

Haldex contends that evidence of FCCC's conduct is relevant with respect to causation and to enable the jury to apportion damages under the Fair Share Act, 42 Pa. C.S. § 7102(a.2). The Pennsylvania General Assembly enacted the Fair Share Act in 2011. In addition to abolishing "true" joint and several liability, the Fair Share Act provides,

> [f]or purposes of apportioning liability only, the question of liability of any defendant or other person who has entered into a release with the plaintiff with respect to the action and who is not a party shall be transmitted to the trier of fact upon appropriate requests and proofs by any party.

42 Pa. C.S. § 7102(a.2).

Prior to the enactment of the Fair Share Act, the Pennsylvania courts had already "held that a defendant has a right to have a settling defendant appear on the verdict form in order to apportion liability[,]" even if a cross-claim has not be filed. *Dunlap v. Ridley Park Swim Club*, No. 3199 EDA 2014, 2015 WL 6667763, at *2 & n.3 (Pa. Super. Ct. Sept. 4, 2015) (citing *Davis v. Miller*, 123 A.2d 422, 424 (Pa. 1956)). The right to have a settling co-defendant appear on the verdict slip is not absolute, though. *Hyrcza v. W. Penn Allegheny Health Sys., Inc.*, 978 A.2d 961, 969 (Pa. Super. Ct. 2009). Rather, "a trial court must determine whether any evidence of a settling co-defendant's liability exists before deciding whether to put that co-defendant on a jury verdict slip." *Id.* (citing *Davis*, 123 A.2d at 424; *Ball v. Johns–Manville Corp.*, 625 A.2d 650 (Pa. Super. Ct. 1993); *Herbert v. Parkview Hosp.*, 854 A.2d 1285 (Pa. Super. Ct. 2004)). "If the evidence is insufficient to support a *prima facie* case against a settling co-defendant," then "such co-defendant may be left off the jury verdict slip." *Id.*

Although Plaintiff concedes that Defendant "has the right to have [FCCC's] conduct considered," she argues that "it can only be upon appropriate submission of proof which will have the potential of rendering FCCC a joint tortfeasor (joint or several), i.e., by expert opinion." Pl.'s Reply 13. According to Plaintiff, such an opinion is lacking. *Id.* at 12. As Plaintiff explains, Haldex's only expert, Randall Petresh, purports to explain in his report how air may have escaped from the system, but he does not actually opine that FCCC was negligent or that the chassis was defectively designed. *Id.* Moreover, while Plaintiff acknowledges that her own expert did provide an opinion regarding the design of the FCCC chassis, she now represents that her expert will not be asked to offer that opinion, since she has settled with FCCC, and thus "any effort to elicit such an opinion would be beyond the scope of direct examination[.]" *Id.* (citing Fed. R. Evid. 611(b); *Trout v. Milton S. Hershey Med. Cntr.*, 576 F. Supp. 2d 673 (M.D. Pa. 2008)).

From the Court's perspective, it is too early to determine whether FCCC should appear on the verdict slip for purposes of apportioning liability. Before the Court can make that determination, it must be in a position to evaluate the sufficiency of the evidence presented at trial with regard to FCCC's alleged negligence or the defectiveness of its design of the chassis. Such an evaluation is impossible at this juncture because no evidence has been presented by either side. Accordingly, the Court will deny Plaintiff's motion without prejudice. Plaintiff may re-raise the issue after the presentation of evidence at trial. In the event that there is sufficient evidence to apportion liability to FCCC, liability would be shared on a pro rata basis, i.e., FCCC would be responsible for 50 percent of the verdict. *See Baker v. ACandS*, 755 A.2d 664, 669 (Pa. 2000) (citing *Walton v. Avco Corp.*, 610 A.2d 454 (Pa. 1992)) ("In strict liability actions, liability is indeed apportioned equally among joint tortfeasors.").

Finally, with respect to Plaintiff's contention that Haldex should not be permitted to cross examine Plaintiff's expert as to the portions of his report addressing the potential liability of FCCC, the Court cannot entirely agree. Cross-examination on such grounds may be "permissible for impeachment purposes[.]" *Stang v. Smith*, No. 09-3311, 2014 WL 11300415, at *8 (Pa. Com. Pl. Carbon Cnty., July 28, 2014). Otherwise, the jury might be given the "false impression that" Plaintiff's expert believes that Haldex alone was responsible for decedent's death when in fact his opinion is more complex than that. *Id.* (citing *Conley v. Mervis*, 188 A. 350 (Pa. 1936)). Such cross-examination may also be permissible "to prove the substantive liability of" FCCC, without "run[ning] afoul of the rule that one party may not compel an expert for the opposing party to offer an opinion against his will." *Id.*; *see also Dunlap*, 2015 WL 6667763, at *5 (citing *Herbert*, 854 A.2d at 1290) ("not[ing] that it is appropriate for [the non-settling defendant] to rely upon expert testimony offered by Dunlap's expert" to establish the settling defendant's liability). Because Plaintiff has not expressly requested a ruling to limit the scope of Haldex's cross-examination of Plaintiff's expert, however, the Court will also defer definitely ruling on these issues until such time as they may arise at trial.

### 4. Evidence Suggesting Contributory Negligence

Plaintiff submits that Haldex should be precluded from offering evidence that Mr. Borzik was contributorily negligent in that he "ignor[ed] warnings" and failed to "us[e] common sense by getting under the vehicle without jack stacks." Pl.'s Br. 5. For its part, Defendant counters that evidence of Mr. Borzik's alleged negligence is relevant under *Tincher* to determine whether the product was defective, as well as to negate causation.

Prior to *Tincher*, "Pennsylvania courts generally bar[red] consideration of contributory negligence in strict liability actions." *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1050 (3d Cir.

1997) (citing *Kimco Dev. Corp. v. Michael D's Carpet*, 637 A.2d 603, 606 (Pa. 1993)). At the same time, however, Pennsylvania courts permitted a defendant "to introduce evidence that the plaintiff assumed the risk," "misused the product, or "engaged in highly reckless conduct to defeat a products liability claim." *Dillinger v. Caterpillar, Inc.*, 959 F.2d 430, 445 (3d Cir. 1992). "Under these limited theories, the appellate courts of this Commonwealth ha[d] held that an inquiry as to a plaintiff's use of a product is relevant as it relates to causation." *Childers v. Power Line Equip. Rentals, Inc.*, 681 A.2d 201, 207 (Pa. Super. Ct. 1996). The reasoning was that if the plaintiff's conduct fell into any of those categories, it was so "unforeseeable and outrageous" that it broke the chain of causation and amounted to a superseding cause of the plaintiff's injuries. *See generally Reott v. Asia Trend, Inc.*, 55 A.3d 1088 (Pa. 2012).

The parties disagree about whether *Tincher* altered this framework. In Defendant's view, "[u]nder the principles announced in *Tincher* . . . evidence of Plaintiff's conduct is" relevant not only insofar as it may relate to causation, but also "with respect to the jury's risk-utility analysis." Def.'s Br. 24. In particular, Defendant argues that Mr. Borzik's conduct is relevant to the fifth Wade factor, which requires an assessment of "[t]he user's ability to avoid the danger by the exercise of care in the use of the product." *Tincher*, 104 A.3d at 390. Plaintiff, on the other hand, contends that evidence of a user's ordinary negligence generally remains inadmissible, while evidence of assumption of the risk, misuse, and highly reckless conduct may be admissible on the issue of causation, just as it was before *Tincher*. Plaintiff further asserts that the relevant inquiry under the fifth Wade factor "is whether the class of ordinary purchasers could avoid injury" by the exercise of due care, "not on the particular conduct of the plaintiff-user." Pl.'s Reply 22.

*Tincher* itself does not resolve this question. Although the *Tincher* Court recognized that its "decision to overrule *Azzarello* . . . may have an impact upon . . . subsidiary issues constructed from *Azzarello*, such as the availability of negligence-derived defenses," it went on to note that it did "not purport to either approve or disapprove [of] prior decisional law, or available alternatives suggested by commentators or the Restatements, relating to" such issues. *Id.* at 432. Instead, the court explained, "[t]he common law regarding these related considerations should develop within the proper factual contexts against the background of targeted advocacy." *Id.*

In this Court's view, *Tincher* cannot be read as doing away with the traditional limitations placed on the admissibility of evidence of a product user's alleged negligence. These limitations originate in comment n of Section 402A of the *Second Restatement*, which provides that "[c]ontributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or guard against the possibility of its existence." *Restatement (Second) of* Torts, Section 402A cmt. n. The Supreme Court of Pennsylvania first adopted the principles in comment n three years before it decided *Azzarello* in *McCown v. Int'l Harvester Co.*, 342 A.2d 381, 382 (1975). The *McCown* Court's rejection of contributory negligence as a defense in products liability cases was not premised on maintaining "doctrinal separation" between strict liability and negligence. *Tincher*, 104 A.3d at 369 n.14 (explaining that "doctrinal separation played a noticeably less prominent role in [*McCown*] relating to whether contributory negligence was an available defense to a strict liability claim"). Policy concerns also animated the court's decision. As the court emphasized, allowing contributory negligence as a defense in products liability actions would "defeat one theoretical basis for [the court's] acceptance of Section 402A[,]" which is that manufacturers "impliedly represent[]" and consumers, in turn, are entitled to assume, that products are safe for their

intended use. *Id.* "One does not inspect a product for defects or guard against the possibility of product defects when one assumes the item to be safe," the court added. "The law should not require such inspection or caution when it has accepted as reasonable the consumer's anticipation of safety." *Id.*

These principles survive *Tincher*. Notwithstanding all of the changes wrought by *Tincher*, the risk of harm still rests with the manufacturer or seller of the product and the focus remains on the product. 104 A.3d at 419. The *Tincher* Court actually echoed its earlier statement in *McCown*, explaining that, "in placing a product on the market, a manufacturer acts to design (and manufacture) the product and, along with other distributors, to sell the product, including making the product attractive for sale by making implicit representations of the product's safety." *Id.* at 402. One such representation – perhaps the most important representation – is that the product is not defective. *Id.* While the risk-utility analysis may invite inquiry into the conduct and choices of the manufacturer vis-à-vis the product *before* the product is brought to market, the "post-marketing" conduct of a particular user is irrelevant for the purposes of determining whether the product itself is defective. *See Johansen v. Makita U.S.A., Inc.*, 607 A.2d 637, 645 (N.J. 1992).

That is true even with respect to the fifth Wade factor. As the Third Circuit has explained, "[t]he Wade factors set forth an objective test to determine whether a product is defective; the 'user' referred to in the factors is the ordinary consumer who purchases or uses the product." *Surace*, 111 F.3d at 1051. Thus, Plaintiff is correct that "the proper focus in applying the fifth Wade factor [] is an objective inquiry into whether the class of ordinary purchasers of the product could avoid injury through the exercise of care in use of the product, not whether this particular [user] could have avoided this particular injury." *Id.* "Put differently," the Court of

Appeals has explained, "the user's ability to avoid injury by the exercise of care in the use of the product appears to be a design factor that may justify a more or less exacting design depending on the facts, but it is, in any case, not a vehicle for injecting a plaintiff's (alleged) failure to exercise due care into the case."[2] *Id.* So in this case, for example, Defendant could offer testimony suggesting that users, in general, might be able to avoid the risk posed by the HCV by always using jack stands or some other support devices while working underneath the vehicle. However, Defendant cannot offer evidence of Mr. Borzik's alleged own lack of due care to negate Plaintiff's attempt to establish that the valve was defective, as such evidence is irrelevant to determining whether the potential risks of putting the product into the market outweighed the potential utility of the product as designed. With these principles in mind, the Court will now address the evidence of Mr. Borzik's conduct upon which Defendant appears to intend to rely.

### 5. Power Gear Leveling System

Haldex argues that Mr. Borzik's failure to use a Power Gear leveling system at the time of the incident is admissible to show that Mr. Borzik was negligent. For the reasons set forth above, however, the Court finds that, even if such conduct amounts to negligence, it is not relevant to performing the risk-utility analysis. Nor does the Court find that Mr. Borzik's failure to use the Power Gear system is relevant to causation, as it does not amount to misuse or highly reckless conduct.[3] *Reott*, 55 A.3d at 1101 (internal quotation marks omitted) (explaining that "highly reckless conduct is that which occurs when the plaintiff would have been injured despite

---

2. The Court recognizes that the court in *Sliker* concluded that evidence of a plaintiff's conduct was relevant "to the factfinder's application of the risk-utility standard, because the user's ability to avoid danger by the exercise of care in the use of the product will logically factor into a reasonable manufacturer's conduct." 2015 WL 6735548 at *4. While the Court finds some portions of *Sliker* persuasive, it parts ways with that opinion on this point.

3. Assumption of the risk will be discussed *infra*.

the curing of any alleged defect, or is so extraordinary and unforeseeable as to constitute a superseding cause").

As a factual matter, Haldex's argument also suffers from serious flaws. Contrary to what Haldex contends, there is no evidence to suggest that the Power Gear system was designed to be used to support the motorhome while working or performing maintenance underneath it. As Plaintiff points out, the Power Gear manual states that the system "is a leveling system *only* and is not intended to lift [the] coach completely off the ground." Manual at 3 (emphasis in original). The manual also advises users that they should not "attempt[] to lift [their] coach completely off the ground (for example, to use this leveling system to change a tire)[.]" Since the system was not intended to be used in the manner suggested by Defendant (i.e., to support the frame while performing maintenance underneath the vehicle), it would be highly misleading for Haldex to be allowed to argue that Mr. Borzik's failure to use this system contributed to his death. Accordingly, no references to the Power Gear system will be permitted at trial.

### 6.  Jack Stands, Jacks, Blocks or Other Devices

Likewise, evidence that Mr. Borzik failed to use jack stands or some other devices to support the vehicle is not relevant to the risk-utility analysis and fails to rise to the level necessary to show misuse or highly reckless conduct. This theory also suffers from similar flaws to Haldex's theory regarding the use of the Power Gear leveling system. Haldex contends that Mr. Borzik disregarded "instructions and warnings (including those contained in the vehicle manuals) that advised him to place safety stands under the chassis before performing work under the motor coach." Def.'s Br. 25. But the "instructions and warnings" upon which Haldex

appears[4] to rely do not support the view that jack stands or the like should be used no matter the type of maintenance being performed. "Rather," the Court agrees with Plaintiff that "[the maintenance manual]" – at least the portions of which the Court has been provided – "recommends the use of jack stands under the frame *only* when the tires are lifted or jacked off the ground or in an inspection where the suspension system is jacked or lifted to or toward its upper limit." Pl.'s Reply at 15 (emphasis in original). At the time of the incident, Mr. Borzik was not performing any maintenance that required him to jack or lift any part of the coach or stretch the suspension, so the sections of the manual upon which Haldex seems to be relying did not apply. It would be highly misleading to allow Haldex to argue otherwise (unless, of course, it can come forward with specific warnings that applied to the situation at hand that Mr. Borzik failed to heed, which it has not done to this point).

### 7. Assumption of the Risk

Haldex also raises the defense of assumption of the risk, which, as already noted, is a valid defense in a products liability case inasmuch as it goes to whether the alleged defect actually caused the alleged harm. "'To establish voluntary assumption of the risk,'" however, "the defendant must show that the buyer knew of a defect and yet voluntarily and unreasonably proceeded to use the product.'" *Reott*, 55 A.3d at 1096 (quoting *Gaudio v. Ford Motor Co.*, 976 A.2d 524, 541 (Pa. Super. Ct. 2009)).

Here, largely for the reasons already discussed, there is no evidence of which the Court has been made aware that Mr. Borzik knew of the defect in the valve but nonetheless proceeded to get underneath the vehicle. And contrary to Haldex's contention, it does not appear that working underneath a motorhome without jack stands or some other device supporting the

---

4. The Court says *appears* to rely because Haldex has not specifically identified the warnings that Mr. Borzik failed to heed.

vehicle presents such an obvious risk that Mr. Borzik's knowledge of it can be presumed. As Plaintiff points out, the maintenance manual even contemplates that some maintenance, similar to that which Mr. Borzik was performing, can be done without the use of jack stands. Instead, users are simply advised to chock the tires and apply the vehicle's parking break. Accordingly, the jury will not be instructed on the defense of assumption of the risk, as there is no evidence in the record to support this theory.

### 8. Testimony Suggesting that Decedent "Took Risks"

Plaintiff argues that Haldex should be precluded from "introduc[ing] testimony [from two of Mr. Borzik's friends and his girlfriend] . . . that Mr. Borzik was a risk taker in various recreational pursuits such as riding motorcycles or used bad judgment on the day of his death." Pl.'s Br. 8. To be more specific, Plaintiff anticipates that Defendant will attempt to introduce the testimony (1) of Mr. Borzik's friend, Tim Phillips, who testified in a deposition that he believed Mr. Borzik was not wearing a helmet during a motor cycle accident in 2006; (2) of Mr. Borzik's friend, Mark Zuspan, who testified that he believed Mr. Borzik was a risk taker before his 2006 motorcycle accident and also that he wished Mr. Borzik had used a jack whenever he was underneath the motorhome; and (3) of Mr. Borzik's girlfriend, Sherri Whipkey, who testified that she believed Mr. Borzik used poor judgment on the day of his death and that "she was absolutely sure that when the rear wheel of the trailer was on a wheel chock presumably to change a tired [sic], it placed pressure on the trailer hitch." *Id.* Haldex counters that, as a general matter, "[e]vidence that Mr. Borzik knew it was unsafe to work underneath the vehicle is relevant and admissible to prove assumption of the risk, misuse, and causation." Def.'s Br. 29. Haldex has not, however, specifically responded to Plaintiff's arguments regarding the particular portions of testimony that Plaintiff contends are not admissible. Thus, it is unclear whether Haldex actually

intends to attempt to elicit any of the challenged testimony at trial; indeed, Haldex has noted that it does *not* intend to introduce testimony and evidence regarding the 2006 motorcycle accident, which could encompass some of the challenged testimony.

Assuming that Haldex does intend to introduce such testimony, however, the Court agrees with Plaintiff that it is not admissible. While Haldex may well be correct that evidence of Mr. Borzik's state of mind is relevant to prove assumption of the risk, the challenged portions of testimony do not actually reveal anything about Mr. Borzik's state of mind or his subjective understanding of the risks involved. Rather, the testimony of Mrs. Phillips and Zuspan related to the 2006 motorcycle accident, making it a clear-cut example of inadmissible character evidence under Fed. R. Evid. 404(a)(1). Moreover, the opinions of Mr. Zuspan and Ms. Whipkey regarding whether Mr. Borzik used bad judgment on the day in question amount to inadmissible lay opinion testimony under Fed. R. Evid. 701, as neither witness's opinion would be helpful to the jury's understanding of the facts. Such testimony would, instead, usurp the jury's role in determining the facts. *See Hirst*, 544 F.3d at 226.

### 9. Prior Incidents and Lack of Prior Claims/Incidents

Plaintiff intends to offer "evidence of other Model CR HCV valves reported to have leaked air or failing because of contamination." Pl.'s Br. 9. According to Plaintiff, "[t]his evidence is recorded on various Haldex documents[,]" and, although the evidence "does not reveal any claim for injury or death," it does depict "failures of the CR valves for reasons consistent with [P]laintiff's theory[.]" *Id.* Haldex responds that Plaintiff's request for a ruling on the admissibility of this evidence is premature because the Court has yet to receive evidence regarding the existence and similarity of the prior incidents. The Court agrees with Haldex.

"[E]vidence of prior occurrences and accidents involving a product which is identical or substantially similar to the product which has allegedly caused an injury has generally been held to be admissible" in products liability cases.[5] *Barker v. Deere & Co.*, 60 F.3d 158, 162 (3d Cir. 1995) (quoting 2A Louis Frumer & Melvin Friedman, *Products Liability* § 18.02[1], at 18–14 to 18–17 (1995)). However, "the evidence is admissible only if the proponent demonstrates that the accidents occurred under circumstances substantially similar to those at issue in the case at bar." *Id.* (citations omitted). Before the Court can make a "reasoned determination as to whether the prior accidents are 'substantially similar[,]'" it "must be apprised of the specific facts of [the] previous accidents[.]" *Id.* at 163. "This foundational requirement . . . is especially important in cases" like this one "where the evidence is proffered to show the existence of a design defect" because "the jury is invited to infer from the presence of other accidents that a design defect existed which contributed to the plaintiffs' injuries." *Id.* at 162-63.

To date, Plaintiff has not proffered any evidence upon which the Court can make a determination as to whether the prior incidents involving other valves were similar to the accident that resulted in Mr. Borzik's death. Accordingly, the Court will defer ruling on Plaintiff's request to deem this evidence admissible until trial, prior to which time Plaintiff must apprise the Court "of the specific facts of [the] previous accidents" to enable the Court to make a reasoned decision on the issue of admissibility. *Id.* at 163.

On the other hand, Plaintiff seeks to preclude Haldex from introducing evidence of the lack of prior claims/incidents involving the subject valve, arguing that reliable evidence regarding the same does not exist. In general, "evidence concerning the absence of prior

5.      Although the parties both cite Pennsylvania law on this issue, it is actually governed by federal law. *See Forrest v. Beloit Corp.*, 424 F.3d 344, 354 (3d Cir. 2005); *Barker*, 60 F.3d at 161-62.

accidents can satisfy the relevance threshold established by Rule 402." *Forrest*, 424 F.3d at 355. "[S]uch evidence may be relevant to show (1) the absence of the alleged defect; (2) the lack of a causal relationship between the injury and the defect or condition charged; and (3) the nonexistence of an unduly dangerous situation." *Id.* At the same time, however, such evidence, "by its very nature, raises significant concerns regarding unfair prejudice to the plaintiff[.]" *Id.* at 358. For example, just because a witness "does not know of any prior accidents does not prove that no such accidents occurred." *Id.* at 357 (citation omitted). Also, "generalized assertions concerning an alleged absence of accidents" can only be rebutted "with specific evidence of prior occurrences, but such evidence may be difficult or impossible for a plaintiff to obtain in cases where the defendant has not kept records concerning the safety history of its products." *Id.* Finally, "the absence of prior accidents may simply mean that the plaintiff was the first to be injured" and it says nothing about how many "near-misses" may have occurred." *Id.*

Thus, before admitting this type of evidence, "[d]istrict courts are required under Rule 403 to balance the probative value of such evidence against its likely prejudicial effect." *Id.* at 358. "In an effort to ascertain probative value and minimize undue prejudice, other courts considering such evidence have consistently insisted that the offering party lay a proper foundation." *Id.* In order to do so, the proponent of the testimony must establish three elements:

> *(a) similarity*—the defendant must show that the proffered testimony relates to substantially identical products used in similar circumstances; (b) *breadth*—the defendant must provide the court with information concerning the number of prior units sold and the extent of prior use; and (c) *awareness*—the defendant must show that it would likely have known of prior accidents had they occurred.

*Id.*

While Plaintiff is correct that Haldex has not come forward with any evidence to establish these elements in response to Plaintiff's motion, Haldex explains that it "intends to

offer such testimony and other foundational evidence at trial." Def.'s Br. 31-32. Haldex will be permitted to attempt to do so. Thus, Plaintiff's motion will be denied without prejudice. Plaintiff may renew the motion at trial if Defendant cannot lay a proper foundation.

### C. Conclusion

For the reasons hereinabove stated, Plaintiff's motion will be **GRANTED IN PART** and **DENIED IN PART**. An appropriate Order follows.

McVerry, S.J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BONNIE RAPCHAK**, *Executrix of the Estate*<br>*of John E. Borzik, Deceased*,<br><br>                **Plaintiff**,<br><br>     **v.**<br><br>**HALDEX BRAKE PRODUCTS**<br>**CORPORATION**,<br><br>              **Defendants**. | )<br>)<br>)<br>)  **2:13-cv-1307**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

     **AND NOW**, this 14th day of July, 2016, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that PLAINTIFF'S MOTIONS IN LIMINE AND REQUEST FOR EVIDENTIARY RULINGS (ECF No. 188) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) Plaintiff's requests to preclude "[a]ny argument or evidence suggesting or attempting to prove contributory negligence on the part of decedent[;]" "[a]ny reference to or use of documents produced by Power Gear relative to the use of a leveling system on the motorhome which was not being used[;]" "[a]ny reference to or evidence that decedent failed to use jack stands, jacks, blocks or other devices to support the suspension when the engine was off and he was not changing a tire or jacking/raising the suspension or frame of the motorhome[;]" "[a]ny reference to or evidence calculated to argue assumption of the risk [;]" and "[a]ny reference to or evidence of the beliefs or lay opinions of witnesses regarding decedent's actions, judgment or attitudes on dates preceding the subject incident or with his interaction with the motorhome on the day of his death" are **GRANTED**;

(2) Plaintiff's requests to preclude "[a]ny argument or evidence of using concepts of negligence or due care on the part of the defendant in designing, making, and selling the subject product, including evidence of compliance with state-of-the-art practices, industry standards, or government regulations[;]" "[a]ny argument or evidence of opinions or beliefs of Freightliner Custom Chassis Corporation (FCCC) regarding the safety or quality of the subject HCV[;]" "[a]ny argument or evidence attempting to

prove that FCCC was negligent or at fault in its design of its chassis so as to be a cause of the subject incident[;]" and "[a]ny evidence of a lack of prior claims of injury or death related to a malfunctioning CR model valve" are **DENIED WITHOUT PREJUDICE** to Plaintiff's ability to re-raise these issues at trial; and

(3) Plaintiff's motion to preclude "[a]ny reference or evidence of receipt by decedent of collateral sources of money[;]" and "[a]ny reference to or evidence that decedent was involved in a motorcycle collision years before and/or received compensation" is **DENIED AS MOOT**.

BY THE COURT:
s/Terrence F. McVerry
Senior United States District Judge

cc:     **John A. Caputo, Esquire**
        Email: ginny@jcaputo.com

        **Kenneth T. Newman, Esquire**
        Email: knewman@tthlaw.com
        **Steven G. Emerson, Esquire**
        Email: semerson@stinson.com
        **Thomas H. Davis, Esquire**
        Email: tdavis@stinson.com

        **Robert J. Behling, Esquire**
        Email: rbehling@dbbk.com
        **Eric D. Stubenvoll, Esquire**
        Email: estubenvoll@fisherkanaris.com